# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF IDAHO

_____

**In Re:**
**Roger D. Bolton and**                    **Bankruptcy Case**
**Vickie L. Bolton,**                       **No. 09-40987-JDP**

                              **Debtors.**

_____

## MEMORANDUM OF DECISION
_____

Appearances:

> Brent Robinson, ROBINSON & ASSOCIATES, Rupert, Idaho,
> Attorney for Debtors.

> Heidi Buck-Morrison, RACINE OLSON NYE BUDGE & BAILEY,
> CHTD., Pocatello, Idaho, Attorney for Trustee.

### *Introduction*

On April 14, 2017, Roger and Vickie L. Bolton ("Debtors") amended

their schedule B in the bankruptcy case to include their products liability

claim against a manufacturer arising out of Mr. Bolton's hip replacement.

Dkt. No. 120 at 3.  Debtors also amended their schedule C to claim 100% of

the value of the claim exempt under Idaho Code § 11-604(1)(c).  Dkt. No.

MEMORANDUM OF DECISION – 1

120 at 5. Chapter 7[1] trustee, Gary L. Rainsdon ("Trustee"), filed an

objection to Debtor's amended exemption claim. Dkt. No. 122. Debtors

responded to the objection, arguing that Mr. Bolton needs all of the funds

that may derive from his products liability claim for support. Dkt. No. 133.

On September 18, 2017, the parties filed a stipulation, agreeing to

limit the issue for the Court to determine at this time to whether Debtors'

claim against the manufacturer of the alleged defective hip device is

property of the estate. Dkt. No. 145.[2] The parties filed pre-hearing briefs,

Dkt. Nos. 148, 150, 151, 153, along with declarations and affidavits with

attachments. Dkt. Nos. 149, 152.

On October 18, 2017, the Court conducted a hearing at which the

---

[1] Unless otherwise indicated, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101–1532 and all Rule references are to the
Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

[2] By amending their bankruptcy schedules to list the products liability
claim and exemption, Debtors arguably admitted that it is property of the estate.
However, their response to Trustee's objection to the exemption claim indicates
these amendments were made "out of caution", and that they believed that the
products liability claim was not property of the estate because it arose
postpetition. *See* Dkt. No. 133 at 2. Trustee has not argued that judicial estoppel
applies here, and the Court expresses no opinion on that topic.

MEMORANDUM OF DECISION – 2

parties argued their positions and answered questions from the Court.

The Court continued the hearing to allow the parties to supplement the

record.  The parties submitted additional documentary evidence and filed

supplemental briefs.  Dkt. Nos. 156–58.

On November 15, 2017, the Court conducted a second hearing

concerning the objection.  Thereafter, the Court took the issues under

advisement.  Having considered the parties' evidence, briefs, and

arguments, as well as the applicable law, this Memorandum sets forth the

Court's findings, conclusions, and reasons for its disposition of the

objection.  Rules 7052; 9014.

### *Facts*

On October 16, 2007, Mr. Bolton underwent right hip replacement

surgery performed by Dr. Mark B. Wright in Twin Falls, Idaho.  Robinson

Aff. Ex. A, Dkt. No. 152-1 at 17.  One month later, Mr. Bolton had a follow-

up visit with Dr. Wright.  Dkt. No. 152-1 at 24.  Dr. Wright's notes from

that visit indicate:

The right hip has no pain with IR/ER.  He has some discomfort

MEMORANDUM OF DECISION – 3

in the groin area with a straight leg test, slightly.

X-Rays were reviewed and show the prosthesis is positioned well.  There is no change in position.

Impression: Right THA, doing well.

*Id.*

Mr. Bolton also saw Dr. Wright a number of times in early 2008.  Dr. Wright's notes from a January 2008 visit observed that Mr. Bolton's hip had an excellent range of motion, that X-rays showed his hip was well-positioned and well-fit, and that Mr. Bolton believed his hip was doing well.  Dkt. No. 152-1 at 25–27.  Dr. Wright's notes from a March 2008 visit reflect that Mr. Bolton was "doing quite well with his right hip.  The pain has gotten significantly better and overall he feels good.  He has some catching and a popping sensation in the hip that is not painful, but it is kind of off when it occurs."  Dkt. No. 152-1 at 26.  And finally, Dr. Wright's notes from an April 2008 visit indicate that he and Mr. Bolton felt the hip was doing well, and that Mr. Bolton was "quite happy with his progress to this point."  Dkt. No. 152-1 at 27.  Dr. Wright instructed Mr. Bolton to

MEMORANDUM OF DECISION – 4

return in six months, but sooner if he was experiencing problems with his

right hip.  Dkt. No. 152-1 at 27.  There is no evidence that such a visit

occurred.

Over a year later, on July 2, 2009, Debtors filed a chapter 7 petition.

Dkt. No. 1.  Trustee served as trustee.  Debtors received a discharge, Dkt.

No. 27, and the "no asset" bankruptcy case was closed on December 19,

2011.  Dkt. No. 112.

On November 11, 2009, over a year and a half after Mr. Bolton's last

visit, Mr. Bolton visited Dr. Wright.  Dkt. No. 152-1 at 30.  Concerning Mr.

Bolton's hip, Dr. Wright's notes recite that "he states that he has groin [sic]

occasionally when he walks for a prolonged time and with prolonged

sitting.  He states that this has been getting worse over the past 6 months."

Dkt. No. 152-1 at 30.  The notes go on:

> [Mr. Bolton] understands that I have concerns [that] the cup
> may be loose. The x-rays show a small radiolucency about the
> cup and with the history of this implant, which I discussed
> with him may represent loosening.  He feels like he can put up
> with it.  For now.  At some point in the future he may benefit
> from replacement of the acetabular component.  I would like
> to try and get more time out of this component because

MEMORANDUM OF DECISION – 5

> Zimmer is trying to engineer a good alternative, which we can
> salvage and replace the acetabular side.

Dkt. No. 152-1 at 32.  The imaging report from that visit provides that

"multiple views show that there may be lucency around the acetabulum.

No evidence of migration."  Dkt. No. 152-1 at 33.

Mr. Bolton apparently "put up with" his hip problems for over a

year.  His medical records indicate he did not see Dr. Wright again until

November 24, 2010.  Dr. Wright's notes from that visit reflect that Mr.

Bolton had experienced pain since his hip replacement in October 2007 that

had gotten progressively more concerning.  Dkt. No. 152-1 at 34.  At that

time, Dr. Wright determined that the cup, and possibly the stem, of the hip

replacement device, would need to be replaced.

On January 18, 2011, Mr. Bolton had a right total hip "revision" of

his replacement.  Dkt. No. 152-1 at 39.  The operative report indicates that

Mr. Bolton "had persistent right groin pain following a total hip

replacement with metal on metal that was done approximately 3 years

ago."  Dkt. No. 152-1 at 39.   The notes from a follow-up visit to Dr. Wright

MEMORANDUM OF DECISION – 6

on February 16, 2011, provide that "[Mr. Bolton] states that at this point he

is doing better than he did after the first operation."  Dkt. No. 149-6.

On March 26, 2012, Debtors retained an attorney for matters related

to Mr. Bolton's hip revision.  Dkt. No. 120 at 4.  On January 2, 2013, Debtors

filed a products liability action against the manufacturer of the components

used in Mr. Bolton's hip replacement surgery in the United States District

Court for the District of New Jersey.  Dkt. No. 157-1 at 3.[3]  In their

complaint, Debtors included causes of action for strict liability, negligence,

breach of implied warranty of merchantability, and breach of express

warranty.  Dkt. No. 157-1 at 4–6.

Over four years later, in a letter dated March 29, 2017, the law firm

representing Debtors in the products liability litigation informed Trustee

that the manufacturer had offered Debtors approximately $235,000 to settle

their claims.  Rainsdon Declaration Ex. B, Dkt. No. 157-2.  On March 30,

---

[3] The action was filed in New Jersey.  A Judicial Panel on Multidistrict
Litigation had previously ordered, pursuant to 28 U.S.C. § 1407, that litigation
against the manufacturer associated with that particular product be centralized
in that district.  *See In re: Zimmer Durom Hip Cup Prods. Liab. Litig.*, 717 F.Supp.2d
1376 (U.S. Jud. Pan. Mult. Lit. 2010).

MEMORANDUM OF DECISION – 7

2017, Trustee filed a motion to reopen Debtors' bankruptcy case to administer Debtors' products liability claim and any recovery, which he believed were property of the bankruptcy estate. Dkt. No. 114. The Court entered an order reopening Debtors' bankruptcy case on March 31. Dkt. No. 115.

On April 14, 2017, Debtors amended their schedule B in the bankruptcy case to include the products liability claim against the manufacturer arising from the hip replacement "and subsequent difficulties that developed in 2011." Dkt. No. 120 at 3. The amended schedule provides that the claim was of "unknown" value. Dkt. No. 120 at 3. At the same time, Debtors also amended their schedule C to claim 100% of the value of the products liability claim exempt under Idaho Code § 11-604(1)(c). Dkt. No. 120 at 5. On April 28, Trustee objected to Debtors' claim of exemption. Dkt. No. 122.

Mr. Bolton submitted to a Rule 2004 Examination in August, 2017. During the exam, he testified that he needed the hip revision surgery because "the disc that went up above the ball . . . was shifting . . . [and] it

MEMORANDUM OF DECISION – 8

was no longer attached." Morrison Decl., Dkt. 149-5 at 28:16–29:5. He also

testified that his original hip replacement surgery in 2007 solved the pain

he was having prior to the surgery. Dkt. No. 149-5 at 27:17–19. He recalled

that it was sometime after he fell "in the early spring or late [sic] of 2010"

that he started noticing that when he walked, his hip "started to hurt worse

than it used to." Dkt. No. 149-5 at 29:9–24.

### *Analysis and Disposition*

The Court must decide whether Debtors' products liability claim

against the hip replacement device manufacturer is property of the

bankruptcy estate under § 541(a)(1) because it was a "legal or equitable

interest[] of the debtor in property as of the commencement of the

[bankruptcy] case . . . wherever located and by whomever held[.]"[4]

"Under the Bankruptcy Code, the filing of a bankruptcy petition

---

[4] As noted above, the Court is informed by the parties that an offer has been made by the manufacturer to settle the products liability claim, but that offer has not been accepted by Trustee and no settlement money has been received. Had that occurred, the issue for the Court would have been whether the settlement proceeds, as compared to the claim against the manufacturer, would constitute estate property. *See* § 541(a)(6) (providing that property of the estate includes "[p]roceeds . . . of or from property of the estate."

MEMORANDUM OF DECISION – 9

creates a bankruptcy estate." *Gladstone v. Bancorp*, 811 F.3d 1133, 1139 (9th

Cir. 2016); § 541(a).  "Property of the bankruptcy estate 'includes nine-non-

exclusive subcategories of property,' stated in subsections (a)(1)-(a)(9) of

§ 541." *Porrett v. Hillen (In re Porrett)*, 564 B.R. 57, 66 (Bankr. D. Idaho 2016)

(citing *Samson v. Western Capital Partners, LLC (In re Blixseth)*, 684 F.3d 865,

871 (9th Cir. 2012)).  "The legislative history of the Bankruptcy Code

reveals the concept of property of the estate to be interpreted broadly."

*Gladstone*, 811 F.3d at 1139 (quoting *Chappel v. Proctor (In re Chappel)*, 189

B.R. 489, 493 (9th Cir. BAP 1995)).  While § 541(a) defines the scope of the

bankruptcy estate, a debtor's "[p]roperty interests are created and defined

by state law." *Butner v. United States*, 440 U.S. 48, 55 (1979).  Whether

property is included in a bankruptcy estate is a question of law.  *MacKenzie*

*v. Neidorf (In re Neidorf)*, 534 B.R. 369, 371 (9th Cir. BAP 2015).

## A.    Law re Accrual of Cause of Action

As noted above, under § 541(a)(1), estate property includes all of

Debtors' legal or equitable interests in property as of the date they filed

their bankruptcy petition.  "The reference [in § 541(a)(1)] to 'as of the

MEMORANDUM OF DECISION – 10

commencement of the case' sets a date of cleavage and establishes the

moment at which the parties' respective rights in property must be

determined." *In re Porrett*, 564 B.R. at 66 (citations omitted).  "Legal causes

of action are included within the broad scope of § 541."  *Goldstein v. Stahl*

*(In re Goldstein)*, 526 B.R. 13, 21 (9th Cir. BAP 2015) (citing *Sierra Switchboard*

*Co. v. Westinghouse Elec. Corp.*, 789 F.2d 705, 707 (9th Cir. 1986)).  *See also*

*McGuire v. United States*, 550 F.3d 903, 914 (9th Cir. 2008) (citing *City & Cty.*

*of San Francisco v. PG & E Corp.*, 433 F.3d 1115, 1126 (9th Cir. 2006)).  "This

includes prepetition tort causes of action."  *In re Goldstein*, 526 B.R. at 21

(citing *Sierra Switchboard*, 789 F.2d at 707).

Debtors sued the manufacturer of the device used in Mr. Bolton's

hip replacement alleging that the product was defective.  In this Circuit, for

bankruptcy law purposes, a debtor's cause of action for products liability

accrues, when "it could have been brought."  *In re Goldstein*, 526 B.R. at 21

(quoting *Cusano v. Klein*, 264 F.3d 936, 947 (9th Cir. 2001)).[5]  To determine

---

[5] In *Cusano*, the Ninth Circuit cited to *In re Swift* when explaining there is a
difference between principles of accrual for bankruptcy property purposes and
for purposes of deciding when a cause of action was discovered or a statute of

MEMORANDUM OF DECISION – 11

when a cause of action accrues, and therefore whether it arose before the

commencement of a bankruptcy case and is estate property, the Court is

instructed to consult state law.  *In re Goldstein*, 526 B.R. at 21 (quoting

*Boland v. Crum (In re Brown)*, 363 B.R. 591, 605 (Bankr. D. Mont. 2007)

(citing *Cusano*, 264 F.3d at 947)).

The Idaho Supreme Court[6] has explained that "[w]hether a cause of

action is based on warranty, negligence, or strict products liability, plaintiff

---

limitations was tolled. 264 F.3d at 947.  In *Swift*, the Fifth Circuit explained that,
in bankruptcy:

> The accrual of a cause of action is a concept closely tied to the
> fundamental purpose of a cause of action—to make an injured
> party whole.  Damages, then, are a prerequisite to a cause of action.
> Without damages, there is no injury to remedy.

*State Farm Life Ins. Co. v. Swift (In re Swift)*, 129 F.3d 792, 796 (5th Cir. 1997)
(citations omitted).

[6] Debtors argue New Jersey law should apply, apparently because the
products liability action against the manufacturer is pending there.  But the
Judicial Panel for Multi District Litigation assigned Debtors' suit to the Court
only for "coordinated and consolidated pretrial proceedings."  *See In re: Zimmer
Durom Hip Cup Prods. Liab. Litig.*, 717 F.Supp.2d 1376, 1378 (U.S. Jud. Pan. Mult.
Lit. 2010).  Moreover, Debtors alleged that jurisdiction and venue in this action
was proper in Idaho because Debtors reside here and that was where the
implantation and revision surgeries occurred.  Compl. at 2, Dkt. No. 157-1.  The
Court will apply Idaho law to resolve the issues in this case.

MEMORANDUM OF DECISION – 12

has the burden of alleging and proving that (1) he was injured by the product; (2) the injury was the result of a defective or unsafe product; and (3) the defect existed when the product left the control of the manufacturer." *Farmer v. Int'l Harvester*, 553 P.2d 1306, 1310–11 (Idaho 1976); *Massey v. Conagra Foods, Inc.*, 328 P.3d 456, 460 (Idaho 2014). Under these requirements, Debtors could not have pursued a products liability claim against the manufacturer (and it would not have accrued for bankruptcy property purposes) until Mr. Bolton was "injured" by the defective hip device.

This conclusion is in line with Idaho statutes concerning the accrual of a personal injury claim. While Idaho Code § 5-219(4) provides that a personal injury cause of action accrues "as of the time of the occurrence, act or omission complained of,"[7] the Idaho Supreme Court has clarified that this statute requires that "there must be 'some damages' before the action begins to accrue." *Stuard v. Jorgenson*, 249 P.3d 1156, 1160 (Idaho 2011)

---

[7] Idaho Code § 6-1403 is the statute of limitation applicable to products liability claims; it incorporates § 5-219 to determine when such a claim accrues.

MEMORANDUM OF DECISION – 13

(citing *Lapham v. Stewart*, 51 P.3d 396, 400 (Idaho 2002); *see also Westfall v.*

*Caterpillar, Inc.*, 821 P.2d 973, 980 (Idaho 1991) (holding a products liability

cause of action accrued when damages were experienced).  The court also

requires that, for a claim to accrue, such damages must be "objectively

ascertainable", meaning that "objective medical proof would support the

existence of an actual injury."  *Stuard*, 249 P.3d at 1160 (quoting *Davis v.*

*Moran*, 735 P.2d 1014, 1020 (Idaho 1987)).

    "The date for when a cause of action accrues may be a question of

fact or law.  However, as here, if no disputed issues of material fact exist,

when a cause of action accrues is a question of law for determination by

this Court."  *Reynolds v. Trout Jones Gledhill Fuhrman, P.A.*, 293 P.3d 645, 648

(Idaho 2013) (citations omitted).  Trustee, as "[t]he party seeking to include

property in the bankruptcy estate[,] bears the burden of showing that the

property in question is property of the bankruptcy estate."  *In re Porrett*,

564 B.R. at 66 (citing *In re Neidorf*, 534 B.R. at 372).

## B.    When Did Debtors' Cause of Action Accrue?

    Based upon the Idaho law discussed above, Debtors' products

MEMORANDUM OF DECISION – 14

liability cause of action against the hip device manufacturer could not have

accrued until the "objective medical proof" supported the existence of Mr.

Bolton's injury and damages.  While the parties generally agree about the

applicable law, in application, they disagree as to when Mr. Bolton's injury

was objectively ascertainable and, thus, when his cause of action against

the manufacturer accrued.  Trustee argues that, based on these facts,

Debtors' claim against the manufacturer was objectively ascertainable, at

the latest, two months prior to the commencement of the bankruptcy case

in July 2009.  Debtors argue that their cause of action was not objectively

ascertainable until, at the earliest, Mr. Bolton's November 2009 visit with

Dr. Wright, some four months after the petition date.

There is some evidence that Mr. Bolton's injury from his hip

replacement was objectively ascertainable prepetition.  Dr. Wright's notes

from the November 2010 visit, approximately three years after his original

surgery, provide Mr. Bolton had experienced pain ever since his October

2007 surgery.  The operative report from the January 2011 revision surgery

also reflects that Mr. Bolton had persistent pain following the original

MEMORANDUM OF DECISION – 15

surgery.

However, Dr. Wright's notes from Mr. Bolton's after-surgery follow-up visits in late-2007 and early-2008 indicate that his original hip replacement had progressed well during that time.  The x-rays from November 2007 and January 2008 showed the prosthesis was positioned well.  Furthermore, both Dr. Wright and Mr. Bolton opined that all was "going well" through the April 2008 appointment.

The Court is persuaded that, under Idaho law, Mr. Bolton did not experience an "injury" as a result of the implantation of defective hip device prior to April 2008.  The late-2007 and early-2008 office notes reflected Mr. Bolton's progress to that point, and the Dr. Wright's general notes written in 2010 and 2011 do little to persuade the Court that the 2007 and 2008 notes were inaccurate.

Trustee founds his position that Debtors' product liability claim against the manufacturer accrued prebankruptcy on Dr. Wright's notes documenting Mr. Bolton's November 2009 visit.  They reflect that Mr. Bolton told the doctor that he had hip pain which had progressively gotten

MEMORANDUM OF DECISION – 16

worse in the prior six months.  Trustee interprets Mr. Bolton's comments to

his doctor to mean that, because his hip pain began six months *before* his

November 2009 doctor visit *(ergo,* before the July 2009 bankruptcy filing),

the products liability claims was estate property.

The Court declines to endorse Trustee's logic.  The notes from the

November 2009 office visit may be insightful because they were prepared

near the time of the bankruptcy filing, and because they first document Mr.

Bolton's complaints about his hip.  But even so, simply because Mr.

Bolton's hip pain began six months prior to the visit is not enough to show

his injury from the defective hip device was "objectively ascertainable" on

bankruptcy day.  To the Court, the doctor's notes and other information

from that time are, at best, equivocal on this important point.  For example,

Dr. Wright indicates in the notes that "the cup *may* be loose."  (emphasis

added).  Dr. Wright notes that x-rays performed at that time showed only

"a small radiolucency," which, based upon his nondescript knowledge of

the history of the type of implanted device, "*may* represent loosening."

(emphasis added).  More precisely, the imaging reports included multiple

MEMORANDUM OF DECISION – 17

views that showed there"may be lucency" but that there was "[n]o

evidence of migration."  While the objective medical evidence in

November 2009 certainly allowed Dr. Wright to assume, based on his

subjective knowledge, that there was a problem with Mr. Bolton's repaired

hip, the objective evidence at that time was inconclusive to show that Mr.

Bolton had experienced an "injury" more than four months prior, when

Debtors filed their bankruptcy petition.

Because Trustee has not shown that Mr. Bolton's injury was

objectively ascertainable on the petition date, the Court will not conclude

that Debtor's products liability cause of action was property of the estate

under § 541(a)(1).

## C.    "Sufficiently Rooted in the Prebankruptcy Past"

Although Trustee can not show that Debtors' products liability cause

of action accrued prepetition, he argues that it is nonetheless property of

the estate because it was "sufficiently rooted in the prebankruptcy past."

Debtors disagree.

### 1.    *Segal v. Rochelle*

MEMORANDUM OF DECISION – 18

In *Segal v. Rochelle*, 382 U.S. 375 (1966), the Supreme Court concluded that, under § 70a(5) of the Bankruptcy Act, a loss-carryback tax refund was property of the bankruptcy estate, even though it was received by the debtor after the filing of the bankruptcy petition. The court explained that, under the Act, "it was impossible to give a categorical definition to the word 'property,'" and that the Act's "own purposes must govern." *Segal*, 382 U.S. at 379. Because the "main thrust of § 70a(5) [was] to secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition . . . 'property' ha[d] been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." *Id.* (citations omitted). However, the court tempered these observations by noting that "limitations on the term ['property'] do grow out of other purposes of the Act" such as leaving "the bankrupt free after the date of his petition to accumulate new wealth in the future." Considering these competing policies of the Act, the court concluded a loss-carryback refund received after the bankruptcy filing was nonetheless "sufficiently rooted in the pre-

MEMORANDUM OF DECISION – 19

bankruptcy past and so little entangled with the bankrupts' ability to make

an unencumbered fresh start that it should be regarded as 'property' under

§ 70a(5)." *Id.* at 380. It supported this conclusion by noting that,

"[t]emporally, two key elements pointing toward realization of a refund

existed at the time these bankruptcy petitions were filed: taxes had been

paid on net income within the past three years, and the year of bankruptcy

at that point exhibited a net operating loss." *Id.*

### 2.    Impact of Enactment of the Code

As the legislative history of § 541(a)(1) explains, the result in *Segal*,

an Act case, survived enactment of the Code. *See* S. Rep. 95-989, 82, 1978

U.S.C.C.A.N. 5787, 5868 (observing that "[t]he result of *Segal v. Rochelle*, 382

U.S. 374 (1966) is followed [under the Code], and the right to a refund is

property of the estate.") The Ninth Circuit recognized this in *In re Ryerson*,

739 F.2d 1423 (9th Cir. 1984); *see also In re Feiler*, 218 F.3d 948, 955–56 (9th

Cir. 2000). There, the court explained that the "Code follows *Segal* insofar

as it includes after-acquired property 'sufficiently rooted in the

prebankruptcy past' but eliminates the requirement that it not be entangled

MEMORANDUM OF DECISION – 20

with the debtor's ability to make a fresh start." *Id.* (citing S.Rep. No. 989,

95th Cong., 2d Sess. 82, *reprinted in* 1978 U.S. Code Cong. & Ad.News 5787,

5868).[8]

### 3.    Current Status of the "Sufficiently Rooted" Language

As explained above, because Debtors' cause of action accrued[9]

postpetition, it was not included as property of the bankruptcy estate

under any of the provisions of § 541(a).  Even so, the Court must determine

whether, under *Segal's* "sufficiently rooted" rubric, Debtors' claim against

---

[8] At least one other Circuit has held that "although Congress has specifically approved of *Segal's* result, [its] 'sufficiently rooted' test did not survive enactment of the Bankruptcy Code."  *Burgess v. Sikes (In re Burgess)*, 438 F.3d 493, 498–99 (5th Cir. 2006).  The Fifth Circuit explained:

> "Section 541 now governs what is considered property of the estate, and unlike former § 70a(5) of the Bankruptcy Act, § 541 expressly defines property . . . [and] under current law, a debtor's interest in property may be contingent—or enjoyment of the interest may be postponed—until after bankruptcy, but the debtor must have had a prepetition legal interest nonetheless.

*Id.*

[9] Again, in the Ninth Circuit, "accrual" for these purposes refers to when a claim against another could have been brought by the debtor, something that may be separate and distinct from when that claim accrued for purposes of a statutes of limitation.

MEMORANDUM OF DECISION – 21

the manufacturer had the necessary factual ties to prepetition events to constitute it as property of the bankruptcy estate.

As near as the Court can determine, there is no published Ninth Circuit case law addressing this precise issue. The parties rely on recent decisions from bankruptcy courts from other circuits. Debtors' Br. at 3, Dkt. No. 150 (citing *Sikirica v. Harber (In re Harber)*, 553 B.R. 522, 533 (Bankr. W.D. Pa. 2016) (holding a products liability claim against a replacement hip manufacturer was not "sufficiently rooted" in the prebankruptcy past); *In re Wagner*, 530 B.R. 695, 701 (Bankr. E.D. Wis. 2015) (concluding that, in the case of injuries that are potential but not certain, the discovery rule under Wisconsin law is fairer and more predictable than the "sufficiently rooted" test); Tr.'s Resp., Dkt. No. 151 at 2–4 (citing same cases). *See also In re Purcell*, 573 B.R. 859 (Bankr. D. Kan. 2017) (holding that proceeds from a personal injury settlement were not property of the estate because debtor's claim did not exist prepetition). However, other Ninth Circuit cases persuade the Court to conclude that a cause of action that accrues after bankruptcy cannot be "sufficiently rooted in the prebankruptcy past."

MEMORANDUM OF DECISION – 22

Recall, it was in *In re Ryerson*, that the Ninth Circuit held the

"sufficiently rooted" language survived enactment of the Code.  There, an

agreement provided that in the event of the termination of the debtor's

employment as a district manager for Farmers Insurance Group, he would

be paid his "contract value."  *In re Ryerson*, 739 F.2d at 1424.  Some nine

months after filing his bankruptcy petition, the debtor's employment was

terminated, and the contract value was determined to be approximately

$19,000.  *Id.*  The court held that the debtor's interest "in the 'contract

value,' albeit contingent at the time of filing and not payable until such

time as his [employment] is terminated or cancelled, is includable within

the bankruptcy estate pursuant to section § 541(a)(1)."  *Id.* at 1425.  This

was because, under the debtor's appointment agreement, the contract had

value after debtor completed his first year of service, and at the time he

filed his bankruptcy petition, he had completed four years of service.  *Id.*

Relying on § 541(a)(6), the Ninth Circuit concluded that "any payments

paid upon termination of [debtor's] appointment are also property of the

bankruptcy estate although paid after the commencement of the case, at

MEMORANDUM OF DECISION – 23

least to the extent the payments are related to prebankruptcy services." *Id.*

Importantly, after explaining that the Code follows *Segal* insofar as it

includes after-acquired property "sufficiently rooted in the prebankruptcy

past," the Ninth Circuit explained it was only the value of the contract for

the years of service completed prior to bankruptcy that were "sufficiently

rooted in the prebankruptcy past." *Id.* at 1426.

In comparison, in *In re Schmitz*, about nineteen months after the

debtor, a fisherman, filed a chapter 7 petition, government regulations

were published implementing a fish management plan that allowed

fishermen to be awarded a "quota", that is, an annual catch limit applicable

to future fishing, based on the total weight of the fisherman's catch of

certain fish during "qualifying years." 270 F.3d 1254, 1255–58 (9th Cir.

2000). Over four and a half years postbankruptcy, the debtor was issued

approximately $50,000 worth of quota certificates based on his catches in

the years before bankruptcy. *Id.* at 1256. When the trustee in the

bankruptcy case sought a declaratory judgment that the debtor's

certificates were property of the estate, the bankruptcy court ruled that,

MEMORANDUM OF DECISION – 24

though the government regulations were not adopted until after the

bankruptcy petition was filed, the quota certificates were based entirely on

the  results of the debtor's fishing before bankruptcy.  *Id.*  The Ninth Circuit

reversed the bankruptcy court, explaining:

> On the date that [the debtor] filed his petition, he might have
> had a hope, a wish and a prayer that the Secretary would
> eventually implement the plan then under consideration.
> However, the fact remains that as of the date of the petition,
> [the debtor's] catch history had no value.  At most, there
> existed the possibility that his prior catch record *might* be
> relevant *if* a fishing quota program were ever adopted in a
> form favorable to him *if* his application for such rights were
> granted, and if he could successfully defend against any
> competing challenge to his application. This sort of nebulous
> possibility is not property.

*Id.* at 1257 (emphasis in original).

While the court did not specifically discuss *Segal*, it explicitly

distinguished *Ryerson*, explaining that the quota certificates were not

payments for the debtor's pre-filing fishing, nor were they a form of

deferred compensation received after filing the petition for work

performed before filing.  *Id.* at 1258.  The Ninth Circuit explained that

*Ryerson* and other cases it cited "all involved payments pursuant to

MEMORANDUM OF DECISION – 25

binding pre-existing contracts with well-defined contingency provisions."

*Id.*

### 4. Debtor's Cause of Action is Not "Sufficiently Rooted in the Prebankruptcy Past"

Under the analysis developed in *Ryerson* and *Schmitz*, the Court

concludes that, in order for property acquired post-petition to be

"sufficiently rooted in the prebankruptcy past," it must arise from some

prepetition right or entitlement.[10]  In *Schmitz*, that the debtor had fished

before bankruptcy was of no value until the quota regulations were

enacted postpetition.  In contrast, in *Ryerson*, although the debtor's right to

recover the contract value was contingent on termination of his

employment, the debtor was entitled to that contract value because he had

worked the minimum number of years required under the contract before

---

[10] The Ninth Circuit BAP came to this same conclusion in an unpublished decision.  *In re Bender*, 385 B.R. 800, *4 (9th Cir. BAP 2007), *appeal dismissed*, 586 F.3d 1159 (9th Cir. 2009) (stating "[the Ninth Circuit] has limited its use of *Segal* to situations where a debtor received a post-petition benefit pursuant to a pre-petition right or entitlement.").

MEMORANDUM OF DECISION – 26

bankruptcy.[11]  *See also In re Goldstein*, 526 B.R. at 23 (distinguishing *Schmitz* because the regulations in *Schmitz* created new rights postpetition).

In this case, similar to *Schmitz*, though Mr. Bolton had the manufacturer's product implanted in his hip before bankruptcy, that event was of no value to Debtors as of the date they filed their bankruptcy petition.  As explained above, Debtors' cause of action against the hip device manufacturer would not arise until that device resulted in an injury to Mr. Bolton that was objectively ascertainable.  On bankruptcy day, it remained a "nebulous possibility" that the device would cause him injury.  Put another way, Debtors' cause of action against the manufacturer was not "sufficiently rooted in the prebankruptcy past" so as to constitute property of the bankruptcy estate.  *Schmitz*, 370 F.3d at 1257.[12]

---

[11]  Notably, in *Ryerson*, only that portion of the contract value that was attributable to debtor's prebankruptcy services was held to be property of the estate.

[12]  The Court acknowledges that the Ninth Circuit, in two unpublished decisions, has employed language suggesting that a claim that accrues postpetition may be "sufficiently rooted in the prebankruptcy past."  *See Leroux v. CPA Ins. Co.*, 2017 WL 6547490, *1 (9th Cir. 2017); *Martinez v. Lincoln General Ins. Co.*, 417 Fed.Appx. 711, *1 (9th Cir. 2011).  Those decisions are not precedent,

MEMORANDUM OF DECISION – 27

*Conclusion*

Debtors' cause of action against the hip device manufacturer is not

property of the estate.  As a result, Trustee's objection to Debtors' claim of

exemption is rendered moot, and will be denied in a separate order.

Dated:  January 22, 2018

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

_____

and their brief accounts of the facts and sparse analysis do not persuade the
Court to depart from the reasoning in *Schmitz*.

MEMORANDUM OF DECISION – 28